**Anthony SOUZA et al., Plaintiffs, Appellees,**

v.

**Anthony P. TRAVISONO et al., Defendants, Appellants.**

**No. 74–1041.**

United States Court of Appeals, First Circuit.

Argued May 8, 1974.

Decided June 26, 1974.

W. Slater Allen, Jr., Asst. Atty. Gen., with whom Richard J. Israel, Atty. Gen., was on brief, for appellants.

Ralph J. Gonnella, Providence, R. I., with whom Hodosh, Spinella, Hodosh & Angelone, Providence, R. I., Max D. Stern, Burnham, Stern & Shapiro, Boston, Mass., Stanley Bass, New York City, Richard Boren, and Abedon, Michaelson, Stanzler & Biener, Providence, R. I., were on brief, for appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

This is an appeal from a judgment of the district court holding that, as a matter of constitutional right under the sixth and fourteenth amendments, appellee inmates of the Rhode Island Adult Correctional Institutions (A.C.I.) must be permitted reasonable access to law student assistants of attorneys engaged in the preparation, handling and disposi-

tion of the inmates' legal problems.[1] In their complaint, the inmates had sought to enjoin as unconstitutional an unwritten administrative policy recently promulgated by A.C.I. Warden James W. Mullen, which assertedly had the effect of denying to A.C.I. inmates access to law students serving as agents [2] of the Inmate Legal Assistance Program (I.L. A.P.).[3] At the time that suit was commenced, the I.L.A.P. operated as a federally funded legal services organization based at the A.C.I. and staffed by two full-time attorneys.[4]

■ Though the question has not been previously considered, either by opposing counsel or by the district court in the proceedings below, this court has necessarily been concerned with the potential impact of 28 U.S.C. § 2281 (1970) upon the proper exercise of district court jurisdiction to pass upon the merits of this matter. However, after full consideration of both the essential purposes underlying § 2281 and of the particular and somewhat unique facts of the instant case, we have concluded that

a three-judge court is not warranted under the circumstances here presented.

By its terms, § 2281 compels the convening of a three-judge district court whenever an "interlocutory or permanent injunction [is sought on constitutional grounds] restraining the enforcement, operation or execution of any State statute . . . or of an order made by an administrative board or commission acting under State statutes." However, because the fundamental Congressional purpose behind § 2281 was "to prevent a single federal judge from paralyzing a state regulatory scheme and to provide procedural protection against the infliction of 'improvident statewide doom' by a federal court" upon significant state policies, Gay v. Board of Registration Commissioners, 466 F.2d 879, 882 (6th Cir. 1972); see also Moody v. Flowers, 387 U.S. 97, 101, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967); Swift & Co. v. Wickham, 382 U.S. 111, 119, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965), the scope of that section has generally been extended to cover injunc-

1. The district court also ruled that the existing attorney-inmate consultation facilities at the A.C.I. were substantially inadequate and did not guarantee that the private legal communications between counsel and client would be protected. Consequently, the court held that this lack of confidential accommodations seriously impinged upon the inmates' right to effective assistance of counsel and instructed the state to come up with a plan for remedying the situation. The court's factual determinations are amply supported by the record, and its legal conclusions flow permissibly therefrom. See, e. g., Parker v. United States, 358 F.2d 50, 53 (7th Cir. 1965), cert. denied, 386 U.S. 916, 87 S.Ct. 872, 17 L.Ed.2d 788 (1967); Coplon v. United States, 89 U.S.App.D.C. 103, 191 F.2d 749, 757 (D.C.Cir. 1951), cert. denied, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952); Smith v. Robbins, 328 F.Supp. 162, 164–165 (D.Me.1971), aff'd in part, vacated in part, 454 F.2d 696 (1st Cir. 1972). Other issues raised and decided by the district court have apparently not been pressed by the state on appeal.

2. As the district court found, the general responsibilities of the law students consisted of (1) ascertaining, on the basis of a personal interview, the inmate's financial status in order to determine whether the inmate met the I.L.A.P.'s indigency requirements, (2) preparing a complete and accurate fac-

tual summary of the inmate's specific legal problem, once indigency had been determined, and (3) crystallizing and researching the relevant legal issues presented so that the matter could be expeditiously reported to a staff attorney and the proper action taken thereon.

3. From September 1972 through June 1973, up to fifteen law students, serving as assistants to the I.L.A.P. staff attorneys, were regularly granted access to inmates for the purposes of aiding in the resolution of the inmates' legal problems. See note 2, supra. However, immediately following the June 22, 1973 murder of a correctional officer at the A.C.I., Warden Mullen, who had relieved Warden Howard after a devastating prison riot the previous April, promulgated the "non-access" policy presently being challenged. Nonetheless, the record makes perfectly plain that neither the existence of the I.L.A.P., nor of its law student assistants, in any way contributed to the riot or the murder of the guard.

4. The I.L.A.P. provided indigent prisoners with a broad range of legal services, consisting in part, of actions involving civil rights, post-conviction relief, divorce, bankruptcy, probate and bail. In addition, the I.L.A.P. served as liaison with the Rhode Island Public Defender Service with respect to a prisoner's pending criminal trial.

tions sought against formal administrative practices which embody important statewide considerations, and this may well include, in an appropriate case, prison regulations and policies. *See, e. g.*, Clutchette v. Procunier, 497 F.2d 809, (9th Cir. 1974); Sands v. Wainwright, 491 F.2d 417 (5th Cir. 1973); McCarty v. Woodson, 465 F.2d 822 (10th Cir. 1972). Nonetheless, since, in enacting § 2281, Congress was concerned strictly about the potentially unwarranted invalidation of a *statewide* administrative or statutory scheme, it has been repeatedly held that a single judge has jurisdiction over the case "where the [challenged] statute or regulation is of only local import." Board of Regents v. New Left Education Project, 404 U.S. 541, 542, 92 S.Ct. 652, 653, 30 L.Ed.2d 697 (1972); *see also* Moody v. Flowers, *supra*, 387 U. S. at 101–102, 87 S.Ct. 1544. As we view the record in the instant case, we cannot definitely say that the prison administrative policy under attack here can legitimately be considered to be one of statewide application. Consequently, though the policy is challenged on constitutional grounds, § 2281 can have no application. *See, e. g.*, Clutchette v. Procunier, *supra*; Metcalf v. Ogilvie, 436 F.2d 361 (7th Cir. 1970); Hatfield v. Bailleaux, 290 F.2d 632 (9th Cir.), cert. denied, 368 U.S. 862, 82 S.Ct. 105, 7 L.Ed.2d 59 (1961).

The State of Rhode Island has but one adult correctional facility, the A.C.I., which is composed of a Maximum Security Unit, Medium Security Unit, Minimum Security Unit, Work Release Unit, and Women's Division. Despite appellees' allegation that the challenged prison administrative policy deprives all A. C.I. inmates of access to law students, it appears, on the basis of the evidence actually presented to the district court, that this policy may only apply selectively to certain portions of the A.C.I., and not to others. Particularly, it appears from the record that the "non-access" policy specifically extends to inmates housed at the Maximum and Medium Security Units, where the greatest threats to prison security exist. The verified affidavits of the law students denied ac-cess to A.C.I. inmates explicitly reveals only that they were "not . . . allowed access to inmates confined in *the A.C.I. Maximum or Medium security facilities.*" Consequently, while a regulation or policy clearly affecting the entire A.C.I. might arguably be said, as the fortuitous result of the existence of a single state prison, to be of "statewide" applicability, that circumstance need not be directly confronted here. Moreover, the Training School for Boys, and the separate and distinct Training School for Girls, which are both divisions of the Rhode Island Department of Corrections, are not under the control of the A.C.I. Consequently, even regulations and policies which fully affect the A.C.I. would not necessarily extend to those institutions, and it may conceivably be that in order for statewide applicability to attach, the challenged regulation or policy would have to encompass these training facilities as well. *See, e. g.*, McCarty v. Woodson, *supra*, 465 F.2d at 826; *cf.* Rothblum v. Board of Trustees, 474 F.2d 891 (3d Cir. 1973). We leave that point for future consideration.

■ But even if the "non-access" policy at issue here could be fairly said to be of statewide application, we would still have grave doubts as to the applicability of § 2281. Essentially, the challenged policy represents the relatively informal reaction of one individual, Warden Mullen, to a particular set of exigencies. And while recognizing that a single prison administrator may, in an appropriate manner, promulgate regulations or practices so authoritative in their establishment of state policy as to require a three-judge panel when challenged, *see* Gilmore v. Lynch, 400 F.2d 228 (9th Cir. 1968), cert. denied, 393 U. S. 1092, 89 S.Ct. 854, 21 L.Ed.2d 783 (1969), we do not believe that the instant policy can be so characterized. The "non-access" order under consideration was formulated unilaterally by Warden Mullen with minimal deliberation or evaluation, immediately after the murder of a prison guard in June 1973. *See* note 3 *supra*. It did not represent long-standing prison administrative

practices and was indeed contrary to previous policy. There is no indication in the record that any official of the State Department of Corrections, which supervises the A.C.I., in any way participated in or approved of the new policy. Unlike the *Morris* rules, *see* Morris v. Travisono, 310 F.Supp. 857 (D.R.I. 1970), this policy has never become standard operating procedure as embodied in specific Departmental regulations. Consequently, we do not believe that it necessarily represents a considered state judgment on the matter, or that, by nature, it constitutes the sort of important state policy which § 2281 was designed to protect. Given the Supreme Court admonition that § 2281 be read "not as a measure of broad social policy to be construed with great liberality, but as an enactment technical in the strict sense of the term and to be applied as such," Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 483, 85 L.Ed. 800 (1941), we see no sensible rationale compelling extension of its coverage to include challenges to this particular administrative policy. For this reason, as well as the previously recited lack of statewide application, we hold that § 2281 does not apply and that the district court properly exercised jurisdiction over the case.

 Because we hold that the district court had jurisdiction to consider appellees' constitutional claims, it necessarily follows that this court has jurisdiction to pass upon the merits of the holding below. However, unless it appears absolutely essential, we are reluctant to expressly decide at the present time the difficult and potentially controversial constitutional questions which taking into consideration the recent Supreme Court opinion in Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), remain for our determination. In *Martinez*, after noting that "the constitutional guarantee of due process of law has as a corollary the requirement that prisoners be afforded access to the courts in order to *challenge unlawful convictions and to seek redress for violations of their constitutional rights*," *id.* at 419, 94 S.Ct. at 1814 (emphasis supplied), the Court specifically held that a prisoner's rights were unconstitutionally abridged by a state prison administrative rule which entirely proscribed inmate access to law student agents of attorneys.[5] To the extent, therefore, that the law student assistants in the instant case were involved in the handling of inmates' post-conviction relief or civil rights claims, *see* note 4 *supra, Martinez* clearly compels affirmance of that aspect of the district court's decision.[6]

What remains is the question whether inmates must be granted reasonable access to law students for purposes of assisting counsel in the resolution of an

---

5. The Supreme Court did, however, make clear that

> "prison administrators are not required to adopt every proposal that might be thought to facilitate prisoner access to the courts. The extent to which that right is burdened by a particular regulation or practice must be weighed against the legitimate interests of penal administration and the proper regard that judges should give to the expertise and discretionary authority of correctional officials."

Procunier v. Martinez, *supra*, 416 U.S. at 420, 94 S.Ct. 1800. Thus, with respect to access, reasonable administrative regulations or policies clearly relating to *inter alia*, the screening and monitoring of law students visiting the institution, the discipline and control of inmates, and the maintenance of order and safety in the prison, would appear to be permissible. The district court, in its opinion in the instant matter, so recognized.

6. Of course, inmate access *to law students* is not always a matter of constitutional right. The crucial constitutional principle at play in determining the necessity of law student access is the more fundamental right of access *to the courts*, Ex Parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1940), and the corollary right to obtain legal assistance to facilitate such access, Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970). Thus, as the Supreme Court recognized in *Martinez*, the denial of law student assistance must "impose[] a substantial burden on the right of access to the courts" by "inhibit[ing] adequate professional representation of indigent inmates," 416 U.S. at 420, 94 S.Ct. at 1814 before any constitutional right to law student access arises. Such a finding of impaired access was made by the district court below and is fully supported by the record.

**1124**

inmate's more "mundane" legal problems, such as divorce, bankruptcy, and probate. As to this, the record of this case, post-*Martinez,* does not give us any basis for a confident ruling. Nor are we sure that a case or controversy exists. Not only do we not know the present posture of state prison officials who now must in any event permit access of students for assistance to counsel on *Martinez* matters, but the functions of the I.L.A.P. have, since March 31, 1974, been entirely assumed by the Rhode Island Public Defender Service, whose need for and use of student assistants is not a matter of record. Moreover, there is nothing before us to indicate that any of the plaintiffs have counsel who require student assistants. We therefore leave the working out of hopefully mutually satisfactory arrangements to the parties in the light of the changed circumstances.

That portion of the order of the district court relating to access to the Adult Correctional Institution by attorneys or their para legal assistants, including law students, is affirmed to the extent that it is governed by Procunier v. Martinez, *supra.*